NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210275-U

NO. 4-21-0275

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 28, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| LARRY QUIGLIANO II, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Clark County |
| MIDWEST BUCKS, LLC, KENNETH HALCOMB, and | ) | No. 18L16 |
| SHANNON RICHTER, | ) | |
| Defendants-Appellees. | ) | Honorable |
| | ) | Tracy W. Resch, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justice DeArmond concurred in the judgment.
Justice Harris dissented.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed the trial court's grant of summary judgment in favor of the defendants; Indiana law applied to the question of the validity of the liability waiver, and the waiver was upheld where it referred to the defendants' own negligence. In any event, the risk of harm was inherent in the activity of hunting from a ladder stand.

¶ 2    Plaintiff, Larry Quigliano II, appeals an order of the circuit court of Clark County granting summary judgment in favor of defendants, Midwest Bucks, LLC (Midwest), Kenneth Halcomb, and Shannon Richter. Halcomb and Richter were the members of Midwest. Plaintiff sustained injuries when a ladder stand, from which he was hunting deer on property managed by Midwest, collapsed. The trial court granted summary judgment based on a "hunter agreement and release" (hunter agreement) plaintiff signed, waiving any claims against Midwest. On appeal, plaintiff contends that the hunter agreement was unenforceable. We affirm.

¶ 3                        I. BACKGROUND

¶ 4        The following facts are taken from the record, including depositions attached to

the motion for summary judgment and the response thereto. We will supplement the facts as

necessary in our analysis. Midwest is a hunting guide outfitter based in Indiana but permitted to

operate in Illinois. Plaintiff is a resident of New York and an experienced hunter, having hunted

deer for more than 30 years when this accident happened. He is familiar with ladder stands for

hunting deer, having installed over 30 stands for hunting deer on property he owned. Plaintiff has

used ladder stands on his own property since 2011. At his deposition, plaintiff testified that he

"most commonly" uses a ladder stand, rather than any other type of blind or enclosure, when he

hunts deer. A "ladder stand" consists of a ladder with a seat at the top and a platform for placing

one's feet. The device is attached to a tree with a brace and one or more straps at the top.

¶ 5        At an auction in approximately 2014, plaintiff purchased a five-day guided

deer-hunting trip in Illinois sponsored by Midwest. On December 13, 2016, plaintiff and his son,

Vinny, traveled to Marshall, Illinois, for the hunt. When plaintiff made the trip, he understood

that ladder stands would be used as part of the hunt. Either the day of their arrival or the next,

Halcomb presented an orientation at which he explained Midwest's rules. In addition to

attending the orientation, at which hunting from ladder stands was discussed, plaintiff signed the

hunter agreement. Paragraph 2 of the hunter agreement stated: "Midwest grants Hunter the right

to hunt and harvest deer on property managed by Midwest subject to the restrictions contained in

this Agreement." Paragraph 5D of the hunter agreement provided as follows:

> "Hunter agrees and acknowledges that hunting is an inherently dangerous
>
> sport and therefore is solely responsible for Hunter's safety and the safety of
>
> others. Hunter agrees to inspect and secure all hunting stands for safety and to

wear a harness at all times while ascending, hunting in, and descending the hunting stands."

¶ 6 Paragraph 6 of the hunter agreement was titled "Release, Indemnification, and Hold Harmless," and provided as follows:

"Hunter, on behalf of Hunter, his heirs, and personal representatives, hereby releases, waives, discharges and covenants not to sue Midwest, its owners, the landowners of managed properties, agents, employees, and heirs for any and all losses, damages, claims, or liability of any kind on account of injury to the Hunter regardless of the cause while Hunter is on the property or in any manner conducting activity contemplated by this Agreement.

Hunter further agrees to indemnify Midwest, its owners, the landowners of managers [*sic*] properties, agents, employees, and heirs from any and all losses, damages, claims or liability of any kind on account of injury to any other persons or property incurred while Hunter is on the property or in any manner conducting activity contemplated by this Agreement. Hunter agrees to defend, indemnify and hold harmless Midwest, its owners, the landowners of managed properties, agents, employees, and heirs from any claims whatsoever."

¶ 7 Paragraph 7 provided that the hunter agreement shall be construed under Indiana law.

¶ 8 Plaintiff signed the hunter agreement without asking any questions about it. He was familiar with such agreements, having executed them during past hunting excursions with other outfitters.

¶ 9    At his deposition, plaintiff testified to the following. During the first three days of the hunt, plaintiff used a ladder stand once, although he did not recall on which day. Plaintiff knew of an incident (not involving Midwest) approximately three weeks prior to December 17, 2016, in which a man had fallen from a tree stand secured by a single strap and became a quadriplegic. On the afternoon of December 17, 2016, plaintiff's guide, Nick, took him to a spot where a ladder stand was affixed to a tree. At Halcomb's instruction, Nick ascended and descended the ladder to test its stability because it had not been used since the previous summer. When Nick climbed down the ladder without incident, he said, "Everything is good." The ladder was "very narrow," approximately six to eight inches wide, and 15 feet tall. At the top was a fixed railing and a bench for sitting. Plaintiff did not notice how many straps secured the ladder to the tree, but he had no concerns about the ladder stand's safety. There was no safety line on the ladder stand to attach to plaintiff's harness to prevent falls. Nevertheless, plaintiff climbed to the top. Plaintiff could not fit under the railing because of his backpack. Plaintiff attempted to take off his backpack when the ladder "let loose." Plaintiff jumped, landed on his feet hard, and then rolled, screaming for help. While he was on the ground, plaintiff saw the ladder dangling sideways on the tree. He later learned that the single strap at the top of the ladder stand securing it to the tree broke. As a result of the ladder stand's collapse, plaintiff fractured his left ankle and lower back and suffered an abrasion to his left cornea.

¶ 10    Halcomb testified at his deposition as follows. In August 2016, Halcomb moved the ladder stand in question from the woods to the location where plaintiff encountered it on December 17, 2016. On December 17, the ladder stand was secured to the tree with a brace and a single "ratchet strap" at the top. A "ratchet strap" is a nylon strap with a ratcheting device attached. The ratchet strap was tied to the ladder stand as opposed to being affixed with "S

hooks." Prior to the hunt, Halcomb advised plaintiff that the ladder stand had not been checked since August, when Halcomb installed it. On December 17, at the site, Halcomb instructed Nick to inspect the ladder stand. Four or five days after plaintiff's accident, Halcomb went to the site and found the strap lying on the ground. Halcomb testified: "Only thing I can say is the strap broke in the middle of the webbing. It looked like it broke dead center in the middle of the strap." The break, or "split" in the strap, was on the opposite side of the tree from where the ladder stand was situated. Halcomb did not know what caused the strap to break.

¶ 11    On December 14, 2018, plaintiff sued defendants in a six-count complaint alleging negligence and premises liability. Specifically, plaintiff alleged that defendants (1) failed to provide plaintiff with a reasonably safe means to ascend the tree stand, (2) failed to properly inspect and maintain the tree stand so as to prevent the deterioration of the stabilizing strap connecting the tree stand to the tree, (3) failed to remedy the aforementioned deterioration, (4) failed to adequately warn plaintiff of the danger presented by the deterioration, (5) failed to attach the tree stand using additional straps, and (6) failed to provide a safety rope. Defendants interposed the affirmative defenses of comparative negligence and waiver of liability under the hunter agreement. Additionally, Halcomb and Richter asserted that they bore no individual liability.

¶ 12    On April 13, 2020, defendants moved for summary judgment. Relying solely on Illinois law, defendants contended that plaintiff waived any duty that defendants owed him when he signed the hunter agreement. Alternatively, Richter contended that there was no evidence that he was involved in any negligent acts, and he could not be held personally liable as a member of the LLC. In his response to the motion for summary judgment, plaintiff also principally relied on

Illinois law, although he noted the choice of law provision in paragraph 7 of the hunter agreement and cited two Indiana cases related to the enforceability of waivers.

¶ 13        On April 16, 2021, the trial court, applying Illinois law, granted the motion for summary judgment. The court noted that the outcome would be the same under Indiana law.

¶ 14        This timely appeal followed.

¶ 15                          II. ANALYSIS

¶ 16        To prevail on a negligence claim, a plaintiff's complaint must set forth facts establishing (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) an injury proximately caused by that breach. *Ford v. Round Barn True Value, Inc.*, 377 Ill. App. 3d 1109, 1113 (2007). The existence of a duty is essential to a negligence claim. *Miller v. Highway Commissioner of North Otter Township Road District*, 344 Ill. App. 3d 1157, 1164 (2003).

¶ 17        Summary judgment is appropriate when the pleadings, depositions, and admissions, together with any affidavits, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2020); *Stark Excavating, Inc. v. Carter Construction Services, Inc.*, 2012 IL App (4th) 110357, ¶ 21. In ruling on a motion for summary judgment, the court must view all evidence in the light most favorable to the nonmoving party. *Stark Excavating*, 2012 IL App (4th) 110357, ¶ 21. The movant's right to summary judgment must be clear and free from doubt. *Donart v. Board of Governors*, 39 Ill. App. 3d 484, 486 (1976). The pleadings and affidavits must be construed strictly against the movant and liberally in favor of the opponent. *Donart*, 39 Ill. App. 3d at 486. We review a grant of summary judgment *de novo*. *Stark Excavating*, 2012 IL App (4th) 110357, ¶ 21.

¶ 18    We first address the choice-of-law question. As noted, paragraph 7 of the hunter agreement provided that the agreement is to be construed under Indiana law. Defendants' motion for summary judgment relied on Illinois law, as did plaintiff's response, except for the citation of two Indiana cases. During the hearing on the motion for summary judgment, the court inquired of the parties which state's law applies. Defendants argued that "adhesion contracts" are handled similarly under Indiana and Illinois law. Plaintiff argued that the law of adhesion contracts is different in Illinois and Indiana, so Indiana law applies. In its written order, the court decided the enforceability of the hunter agreement under Illinois law but noted that the result would be the same under Indiana law. On appeal, plaintiff asserts that the Indiana choice-of-law provision in the hunter agreement is "clear," and analyzes the issue under Indiana law. However, plaintiff also analyzes the issue under Illinois law, in the event we find that Illinois law applies, and concludes that the hunter agreement is unenforceable no matter which law applies. Defendants argue that the hunter agreement is enforceable under either Indiana or Illinois law.

¶ 19    Enforcing an express choice-of-law provision in a contract is consistent with fulfilling the parties' expectations. *Hall v. Sprint Spectrum L.P.*, 376 Ill. App. 3d 822, 829 (2007). In *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 581 (2011), this court held that we give effect to a contractual choice-of-law provision unless the contract chooses a foreign law that is " 'dangerous, inconvenient, immoral, [or] contrary to the public policy of the local government' " (quoting *Potomac Leasing Co. v. Chuck's Pub, Inc.*, 156 Ill. App. 3d 755, 757-58 (1987)). As the parties raise none of those objections, we give effect to the choice-of-law provision in paragraph 7 of the hunter agreement and apply Indiana law. Because we apply Indiana law, we restrict our analysis to the arguments plaintiff raises under Indiana law: (1) paragraph 6 of the hunter agreement is unenforceable where it is does not specifically and

- 7 -

explicitly refer to defendants' own negligence and (2) plaintiff's risk of injury was not inherent in the nature of the activity.

¶ 20    The intention of contracting parties is to be determined from the four corners of the document. *McCae Management Corp. v. Merchants National Bank & Trust Co. of Indianapolis*, 553 N.E.2d 884, 887 (Ind. Ct. App. 1990). The court must accept a contract interpretation that harmonizes the document's provisions rather than an interpretation that results in conflicting provisions. *McCae*, 553 N.E.2d at 887. Where contract terms are clear and unambiguous, we apply the plain and ordinary meaning of those terms and enforce the contract accordingly. *John M. Abbott, LLC v. Lake City Bank*, 14 N.E.3d 53, 56 (Ind. Ct. App. 2014). We review the contract as a whole, and, if necessary to understand a disputed provision, we refer to other provisions within the four corners of the document. *Abbott*, 14 N.E.3d at 56. We construe the contract's language so as not to render any " 'words, phrases, or terms ineffective or meaningless.' " *Abbott*, 14 N.E.3d at 56 (quoting *Fischer v. Heymann*, 943 N.E.2d 896, 900 (Ind. Ct. App. 2011)). Generally, construction of a written contract is a question of law for the court, with summary judgment being particularly appropriate. *McCae*, 553 N.E.2d at 887. A liability waiver, or release, is interpreted according to the standard rules of contract interpretation. *Haire v. Parker*, 957 N.E.2d 190, 195 (Ind. Ct. App. 2011).

¶ 21    Plaintiff argues that he encountered a latent defect in how the ladder stand was strapped to the tree and how Midwest maintained the strap rather than a risk inherent in the activity of hunting. Therefore, he concludes, Midwest could not absolve itself from liability by a blanket waiver such as that contained in paragraph 6 of the hunter agreement but had to specify that it was absolving itself from its own negligence.

¶ 22          Generally, parties can agree in advance that one has no duty of care for the other's benefit and shall not be liable for the consequences of conduct that would otherwise be negligent. *Terry v. Indiana State University*, 666 N.E.2d 87, 90 (Ind. Ct. App. 1996). Consequently, in the absence of contrary legislation, it is not against Indiana's public policy to enter into an agreement that exculpates one from the consequences of one's own negligence. *Terry*, 666 N.E.2d at 90. Indeed, the purpose of a release is to foreclose claims, thereby facilitating the orderly resolution of disputes. *Sportsdrome Speedway, Inc. v. Clark*, 49 N.E.3d 653, 660 (Ind. Ct. App. 2016). However, Indiana courts hold that such exculpatory clauses must "specifically and explicitly refer to the negligence of the party seeking release from liability." *Anderson v. Four Seasons Equestrian Center, Inc.*, 852 N.E.2d 576, 581 (Ind. Ct. App. 2006). Nonetheless, an exculpatory clause's lack of a specific reference to the defendant's negligence will not preclude releasing the defendant from liability where a plaintiff's damages are "inherent in the nature of the activity." *Anderson*, 852 N.E.2d at 584.

¶ 23          Plaintiff contends that paragraph 6 of the hunter agreement, referred to as a "liability waiver," is unenforceable because it does not "specifically" and "explicitly" absolve Midwest of its own negligence. Paragraph 6 provided as follows:

> "Hunter, on behalf of Hunter, his heirs, and personal representatives, hereby releases, waives, discharges and covenants not to sue Midwest, its owners, the landowners of managed properties, agents, employees, and heirs for any and all losses, damages, claims, or liability of any kind on account of injury to the Hunter regardless of the cause while Hunter is on the property or in any manner conducting activity contemplated by this Agreement.

Hunter further agrees to indemnify Midwest, its owners, the landowners of managers [*sic*] properties, agents, employees, and heirs from any and all losses, damages, claims or liability of any kind on account of injury to any other persons or property incurred while Hunter is on the property or in any manner conducting activity contemplated by this Agreement. Hunter agrees to defend, indemnify and hold harmless Midwest, its owners, the landowners of managed properties, agents, employees, and heirs from any claims whatsoever."

¶ 24 Plaintiff maintains that paragraph 6 is "nothing more than a blanket waiver of liability that makes absolutely no mention of any specific risks and/or Midwest's own negligence." Plaintiff relies on *Powell v. American Health Fitness Center of Fort Wayne, Inc.*, 694 N.E.2d 757 (Ind. Ct. App. 1998). In *Powell*, the plaintiff signed an exculpatory agreement when she joined a health club. *Powell*, 694 N.E.2d at 759. The plaintiff was injured while using the club's whirlpool. *Powell*, 694 N.E.2d at 759. The court held that the exculpatory agreement releasing the club for "any damages" and placing responsibility on the plaintiff for "any injuries, damages, or losses," was void insofar as it purported to release the club from its own negligence. *Powell*, 694 N.E.2d at 761-62. The court noted that "nowhere does the clause specifically or explicitly refer to the negligence of [the club]." *Powell*, 694 N.E.2d at 761.

¶ 25 Plaintiff also relies on *Marsh v. Dixon*, 707 N.E.2d 998 (Ind. Ct. App. 1999). In *Marsh*, the plaintiff was injured while riding a "wind tunnel" called a Dyna-Soar, a machine that simulated the experience of free fall by projecting columns of air upon which patrons levitated. *Marsh*, 707 N.E.2d at 999. The plaintiff sued the ride's owner for gross negligence, and the trial court granted the defendant summary judgment. *Marsh*, 707 N.E.2d at 999. The plaintiff signed a waiver releasing the defendant from "any and all liability, claims, demands, actions, and causes

- 10 -

of action whatsoever arising out of any damages *** in any way resulting from personal injuries *** while flying Dyna-Soar." *Marsh*, 707 N.E.2d at 1000-01. The court of appeals held the waiver invalid because it failed to "specifically and *explicitly* refer to [the defendant's] own negligence." (Emphasis in original.) *Marsh*, 707 N.E.2d at 1001. The court noted that the plaintiff's injury was not sustained from a risk inherent in the nature of the ride, where the ride was supposed to project the plaintiff only four feet into the air but instead shot the plaintiff 15 feet into the air. *Marsh*, 707 N.E.2d at 1001. The court concluded that the accident "must have resulted" from the defendant's negligence, requiring the release to refer specifically and explicitly to the defendant's own negligence to be effective. *Marsh*, 707 N.E.2d at 1001.

¶ 26    *Powell* and *Marsh* are distinguishable because (1) the waivers of liability in those cases are unlike the waiver in our case and (2) the risk that led to plaintiff's injury in our case was inherent in the nature of the activity. Here, defendants fail to acknowledge paragraph 5 of the hunter agreement when discussing the waiver. Plaintiff argues that paragraph 5 is completely unrelated to the waiver-of-liability provision. However, a contract must be read as a whole, and the language must be construed so that no words, phrases, or terms are rendered meaningless or ineffective. *Forty-One Associates, LLC v. Bluefield Associates, L.P.*, 809 N.E.2d 422, 427 (Ind. Ct. App. 2004). We cannot read paragraph 5 out of the contract. Further, we cannot read paragraph 6 in isolation, because paragraph 2 of the hunter agreement informed plaintiff that he was granted the right to hunt "subject to the restrictions contained in this Agreement." Paragraph 5 contained a number of those restrictions as follows:

> "Hunter agrees and acknowledges that hunting is an inherently dangerous
> sport and therefore is solely responsible for Hunter's safety and the safety of
> others. Hunter agrees to inspect and secure all hunting stands for safety and to

wear a harness at all times while ascending, hunting in, and descending the hunting stands."

This paragraph transfers the risk of hunting to plaintiff. This paragraph also specifically refers to hunting stands and transfers the risk of hunting in hunting stands to plaintiff. Thus, when paragraph 5 is read together with paragraph 6, plaintiff agreed to waive any liability of defendants, "*regardless of the cause*," which would include injuries caused by defendants' own negligence. Any other interpretation is inconsistent with shifting the entire risk of injury to plaintiff.

¶ 27    Plaintiff argues that reading paragraph 5 in conjunction with paragraph 6 leads to absurd results. He maintains that he wore a safety harness, as required by paragraph 5, but, as there was no safety line attached to the ladder stand, plaintiff would have had to climb the ladder to attach a rope to the tree and still would have been injured when the ladder stand gave way. This argument misses the mark. Paragraph 5 not only required that plaintiff wear a harness, it also provided that plaintiff assumed the risk for his own safety and that of others. This assumption of the risk negates the elements of duty or breach of duty required to prove a negligence claim. See *Spar v. Cha*, 907 N.E.2d 974, 981 (Ind. 2009).

¶ 28    We agree with defendants that a waiver need not specifically use the word "negligence" where other language conveys the concept that the plaintiff is waiving the defendant's own negligence. Defendants rely on *Avant v. Community Hospital & Fitness Pointe Health Club*, 826 N.E.2d 7, 9 (Ind. Ct. App. 2005), where the plaintiff sued the defendant for injuries he allegedly sustained from a fitness program that the defendant designed. The plaintiff signed a waiver in which he not only generally waived the defendant's liability but also "accept[ed], assume[d], and incur[red] all responsibility for the risk of injury from such activity

- 12 -

and exercise." *Avant*, 826 N.E.2d at 9. The court of appeals held that summary judgment was properly granted in the defendant's favor because the plaintiff "knowingly and willingly" accepted the burden to indemnify and hold the defendant and its employees harmless for their own negligent acts. *Avant*, 826 N.E.2d at 12.

¶ 29    Plaintiff argues that *Avant* is inapplicable because the language of the waiver in that case specifically referred to acts of the defendant as follows:

> "I promise and agree on behalf of myself, my heirs and assigns, not to sue and agree to release, discharge, and hold harmless and indemnify the Fitness Pointe, its agents, employees, members and all other personal [*sic*] or entities acting on its behalf from all claims, demands, rights and causes of action of any kind, *whether arising from my own acts or those of Fitness Pointe*. I hereby waive all claims for personal injury or property damage arising from my activities or use of the facilities and equipment at Fitness Pointe, and I accept, assume[,] and incur all responsibility for the risk of injury from such activity and exercise." (Emphasis added.) *Avant*, 826 N.E.2d at 9.

¶ 30    Although the court of appeals in *Avant* relied on the italicized language that we quoted in upholding the waiver, the court also noted that use of words we associate with the "language of negligence," such as "liability," "damages," "actions," "omissions," "responsibility," and "injury," clearly demonstrate that a release encompasses negligence. *Avant*, 826 N.E.2d at 11.

¶ 31    Plaintiff also argues that *Marshall v. Blue Springs Corp.*, 641 N.E.2d 92 (Ind. Ct. App. 1994), cited by defendants, is distinguishable. In *Marshall*, the issues were different from those raised in the present case. However, defendants cite *Marshall* only for the boilerplate

proposition that it is not against public policy to enter into an agreement that exculpates one from the consequences of one's own negligence.

¶ 32    The dissent concludes that, because there is no "specific or explicit reference to [Midwest's] own negligence in either paragraph 6 or paragraph 5D," nor any reference to Midwest's employees in those paragraphs, the waiver was insufficient to insulate defendants. In interpreting an unambiguous contract, we give effect to the parties' intentions as expressed in the four corners of the agreement. *Hyperbaric Oxygen Therapy Systems, Inc. v. St. Joseph Medical Center of Ft. Wayne, Inc.*, 683 N.E.2d 243, 247 (Ind. Ct. App. 1997). The parties clearly intended in paragraph 5D to shift all liability to plaintiff: "Hunter agrees and acknowledges that hunting is an inherently dangerous sport and therefore is solely responsible for Hunter's safety and the safety of others."  In spelling out that plaintiff was solely responsible for his own safety and that of others, paragraph 5D necessarily relieved defendants of liability for their own negligence. Then, in paragraph 6, the parties clearly intended for plaintiff to "indemnify Midwest, its owners, the landowners of managers [*sic*] properties, agents, employees, and heirs from any and all *losses, damages, claims or liability of any kind* on account of injury to any other persons or property incurred while Hunter is on the property or in any manner conducting activity contemplated by this Agreement." (Emphasis added.) Paragraph 6 also provided that plaintiff released "Midwest, its owners, the landowners of managed properties, agents, employees, and heirs for *any and all losses, damages, claims, or liability of any kind* on account of injury to the Hunter." (Emphasis added.) As paragraph 5D made clear, hunting from hunting stands was contemplated by the hunter agreement, and sole liability was shifted to plaintiff. Paragraph 6 used the "language of negligence." See *Avant*, 826 N.E.2d at 11. Consequently, we

determine that the hunter agreement conveyed the concept that plaintiff was waiving defendants' own negligence.

¶ 33 Even if the hunter agreement did not specifically and explicitly refer to defendants' own negligence, we conclude that such language was unnecessary. The specificity requirement is necessary only when the risk of harm is a "latent" danger. *Anderson*, 852 N.E.2d at 583-84. Where a waiver explains that there are certain risks "inherent" in an activity, enumerates some of those risks, and then the plaintiff engages in the activity, the plaintiff's damages are held to result from a risk inherent in the activity. *Anderson*, 852 N.E.2d at 584.

¶ 34 Here, in signing the hunter agreement, plaintiff acknowledged that hunting, especially from a hunting stand, is an inherently dangerous activity. Paragraph 5D of the hunter agreement required plaintiff to inspect all hunting stands for safety and to wear a harness while ascending, hunting in, and descending the stand. Paragraph 5D also referenced inspecting and *securing* hunting stands for safety: "Hunter agrees to inspect and *secure* all hunting stands for safety." (Emphasis added.) Thus, the waiver advised plaintiff of an inherent danger that such devices could become detached from the tree.

¶ 35 The record shows that plaintiff fully comprehended this risk. At his deposition, plaintiff testified that he "most commonly" hunted deer from ladder stands, having used ladder stands on his own property since 2011, and having installed 30 tree stands on properties he owned. Plaintiff acknowledged that, before the Midwest hunt began, Halcomb discussed with him the dangers of hunting from stands. Plaintiff testified that Halcomb also told plaintiff that the ladder stand in question had not been checked since the previous August. Plaintiff testified that Halcomb, in plaintiff's presence, instructed Nick to inspect the ladder stand. In his deposition, Vinny testified that Nick told him that he (Nick) had checked it.

¶ 36 Also, even though plaintiff did not discover until after his accident that the ladder stand was secured with only one strap at the top, plaintiff testified that he knew certain models of ladder stands were secured with a single strap. Plaintiff said that several weeks before his accident, he heard of someone using a hunting stand secured with a single strap falling and becoming a quadriplegic. Plaintiff was also aware that there should have been a safety line to attach to his harness.

¶ 37 Plaintiff argues that he could not inspect the ladder stand to make sure that it was secured, yet that is what paragraph 5D obligated him to do. Plaintiff, who was familiar with installing tree stands and hunting from them, would know that those devices are exposed to the elements and deteriorate over time. *Bruntz v. Cotton Tail Hunt Club*, 661 S.E.2d 849 (Ga. Ct. App. 2008), is instructive. In *Bruntz*, the plaintiff was injured when he fell climbing up a tree stand to hunt. *Bruntz*, 661 S.E.2d at 849. The Georgia court of appeals affirmed the grant of summary judgment to the defendant, noting that the plaintiff, an experienced hunter, was experienced using tree stands and understood the danger associated with climbing into and out of such stands. *Bruntz*, 661 S.E.2d at 850.

¶ 38 We also find *Anderson* instructive. In *Anderson*, the plaintiff boarded her horse with the defendant, and she also took riding lessons from the defendant. *Anderson*, 852 N.E.2d at 578-79. The plaintiff signed a waiver describing certain "inherent" risks involved in equine activity. *Anderson*, 852 N.E.2d at 578. A sign was also posted advising patrons that the defendant was not liable for injuries resulting from inherent risks of equine activities. *Anderson*, 852 N.E.2d at 579. The plaintiff was injured when she attempted to mount her horse and the horse moved. *Anderson*, 852 N.E.2d at 579. The plaintiff admitted that she was engaged in "equine activities" when she fell. *Anderson*, 852 N.E.2d at 579. The court of appeals held that

the waiver barred the plaintiff's claims against the defendant, even though it did not specifically and explicitly refer to the defendant's own negligence, because the waiver "cautioned" that there were risks inherent in dealing with horses, enumerated some of those risks, and the plaintiff was injured when she engaged in an equine activity. *Anderson*, 852 N.E.2d at 584.

¶ 39　　　　　Plaintiff argues that hunting from an "improperly" installed and maintained ladder stand is not inherent in the activity of hunting and that a factual question exists as to whether an improperly affixed ladder stand presents an inherent risk. According to plaintiff, inherent risks associated with hunting are guns accidentally discharging, tripping, and ricocheting arrows.

¶ 40　　　　　Plaintiff argues a constricted interpretation of the risk. The record shows that (1) ladder stands are attendant to the activity of deer hunting, and, in this case, they were integral to the experience and (2) hunting from a ladder stand poses a risk that the device can collapse. At his deposition, plaintiff testified that he understood that ladder stands would be used as part of the Midwest hunt and that he used a ladder stand during the hunt prior to the day of his accident. As noted, plaintiff also understood in general that tree stands are used for deer hunting, as he had installed approximately 30 of them on properties that he owned, had used ladder stands on his own property since 2011, and "most commonly" hunted from ladder stands rather than other types of blinds or enclosures. That the risk of collapse is inherent in the activity is shown by the admonishment to the hunter in paragraph 5D of the hunter agreement to inspect and *secure* the device. Also, Halcomb testified at his deposition that hunting from tree stands is inherently dangerous, even with properly installed ladder stands and hunters using a safety harness attached to a safety line. Plaintiff presented no contrary evidence. In another context, the supreme court of Minnesota noted that hunting is attended with "almost self-defining risk." *Ganser v. Erickson*,

156 N.W.2d 224, 226 (Minn. 1968). Thus, we disagree with plaintiff's argument that the only inherent risks associated with hunting are errant bullets, ricocheting arrows, and tripping.

¶ 41 The dissent attempts to distinguish this case from *Anderson* and *Wabash County Young Men's Christian Ass'n, Inc. v. Thompson*, 975 N.E.2d 362 (Ind. Ct. App. 2012), on the basis that the plaintiffs in those cases did not allege a defect resulting in injury, whereas, here, plaintiff's complaint alleged that the strap was in a deteriorated condition. The dissent concludes that inherent risks are those "characteristic" of the activity. In *Anderson*, the plaintiff, who was engaged in equine activities, was injured when she tried to mount her horse. *Anderson*, 852 N.E.2d at 579. In *Wabash County*, the plaintiff was injured sliding into second base while playing in a baseball/softball league. *Wabash County*, 975 N.E.2d at 363. However, the plaintiffs in *Wabash County* also alleged that the defendant negligently maintained the condition of second base in that it was "fixed as a rigid obstacle." *Wabash County*, 975 N.E.2d at 363.

¶ 42 The court in *Wabash County* held that "[s]liding into second base, *notwithstanding its rigidity*, is an activity inherent in the nature of playing baseball or softball ***." (Emphasis added.) *Wabash County*, 975 N.E.2d at 367. Thus, the court said that, even though second base was negligently maintained, the risk was inherent in the activity. Here, plaintiff, laden with a backpack, ascended 15 feet into a tree using a "very narrow" ladder affixed to a tree by a brace and a strap. The record shows that it is in the nature of the sport that deer are hunted from tree stands. The record also shows that it is in the nature of the sport that those stands are subjected to the outdoor elements. Consequently, we believe that plaintiff's risk of injury was inherent in the activity, notwithstanding his allegation that the strap was deteriorated.

¶ 43 The dissent asserts that the instant case is like *Marsh*, where, according to the dissent, the plaintiff's injury occurred in a manner "atypical" of the activity in which he engaged.

- 18 -

In *Marsh*, the defendant instructed the plaintiff, who participated in a "Dyna Soar" ride, that the plaintiff would levitate only four feet off the ground. *Marsh*, 707 N.E.2d at 1001. Instead, the ride shot the plaintiff 15 feet into the air and then dropped him to the ground. *Marsh*, 707 N.E.2d at 1001. *Marsh* is distinguishable from our case. First, the court in *Marsh* held that the plaintiff's injury would not have happened in the absence of negligence. *Marsh*, 707 N.E.2d at 1001. Here, we can draw no such conclusion, because immediately before plaintiff was injured, Nick ascended and descended the ladder stand without incident and said, "Everything is good." In addition, in our case, plaintiff produced no evidence of what caused the strap to break. See *Aalbers v. LaSalle Hotel Properties*, 2022 IL App (1st) 210494, ¶ 15 (stating that, though the plaintiff need not prove his or her case at the summary judgment stage, the plaintiff is required to present some evidentiary facts to support the cause of action). Second, plaintiff in our case did not plead *res ipsa loquitur*. See *Johnson v. Armstrong*, 2022 IL 127942, ¶ 35 (stating that for *res ipsa loquitur* to apply, the plaintiff must plead and prove he was injured in an occurrence that does not ordinarily happen in the absence of negligence). Third, the plaintiff in *Marsh* did not expect to be shot 15 feet into the air, whereas, in our case, plaintiff was fully aware of the risk that the ladder stand could collapse. Accordingly, viewing all of the evidence in the light most favorable to plaintiff, we determine that the trial court properly granted summary judgment in favor of defendants.

¶ 44                                    III. CONCLUSION

¶ 45          For the reasons stated, we affirm the trial court's judgment.

¶ 46          Affirmed.

¶ 47          JUSTICE HARRIS, dissenting:

¶ 48        I respectfully dissent. As an initial matter, I agree with the majority's determination that the choice-of-law provision in the hunter agreement should be given effect and that, as a result, Indiana law applies to the issues presented on appeal. However, I disagree that, under Indiana law, summary judgment was properly granted to defendants because the hunter agreement and its exculpatory clause barred plaintiff's negligence claims. I would find the exculpatory agreement in this case does not "specifically and explicitly" refer to the defendant's own negligence as contemplated by Indiana case law. Additionally, in my view, it cannot be said, as a matter of law, that plaintiff's injuries arose from a risk inherent in the nature of the activity in which he was engaged.

¶ 49                          A. Specificity Requirement

¶ 50        "It is well settled in Indiana that exculpatory agreements are not against public policy." *Marsh v. Dixon*, 707 N.E.2d 998, 1000 (Ind. Ct. App. 1999) (citing *Powell v. American Health Fitness Center*, 694 N.E.2d 757, 760 (Ind. Ct. App. 1998)). "Generally, parties are permitted to agree that a party owes no obligation of care for the benefit of another, and thus, shall not be liable for consequences that would otherwise be considered negligent." *Marsh*, 707 N.E.2d at 1000. However, a "requirement of specificity" applies to an agreement which is intended to release a party from liability because of its negligent conduct. *Powell*, 694 N.E.2d at 761. Such an agreement "must both specifically and explicitly refer to the negligence of the party seeking release from liability." *Powell*, 694 N.E.2d at 761. The underlying principle for the specificity rule is that an agreement releasing a defendant from its own negligence must "clearly and unequivocally manifest" that the plaintiff knowingly and willingly made a commitment to be responsible for damages occasioned by the defendant's negligence. (Emphases and internal quotation marks omitted.) *Marsh*, 707 N.E.2d at 1000.

¶ 51 In *Powell*, 694 N.E.2d at 759, the plaintiff was a member of the defendant health club and injured her foot while using a whirlpool on the defendant's premises. The plaintiff filed suit against the defendant alleging her injury was caused by its negligence and the defendant moved for summary judgment based on the plaintiff having signed an agreement containing an exculpatory clause. *Powell*, 694 N.E.2d at 759. Under the exculpatory clause, the plaintiff agreed the defendant would "not be liable for any damages arising from personal injuries" she sustained on its premises or while using its facilities and equipment. *Powell*, 694 N.E.2d at 759. Further, it provided that the plaintiff "assume[d] full responsibility for any injuries, damages or losses" that might occur, and that she agreed to "release and discharge" the defendant "from any and all claims, demands, damages, rights of action, or causes of action present or future ***." *Powell*, 694 N.E.2d at 759.

¶ 52 On appeal, the reviewing court determined the defendant was not entitled to summary judgment as a matter of law. It stated as follows:

> "Nowhere does the clause specifically or explicitly refer to the negligence of [the defendant]. As a matter of law, the exculpatory clause did not release [the defendant] from liability resulting from injuries [the plaintiff] sustained while on its premises that were caused by its alleged negligence. Therefore, the exculpatory clause is void to the extent it purported to release [the defendant] from liability caused by its own negligence." *Powell*, 694 N.E.2d at 761-62.

¶ 53 As defendants point out in this appeal, an exculpatory clause may be considered specific and explicit even when it does not use the word negligence, "so long as it conveys the concept specifically and explicitly through other language." *Avant v. Community Hospital*, 826 N.E.2d 7, 12 (Ind. Ct. App. 2005). In *Avant*, 826 N.E.2d at 9, the release at issue did not contain

the word negligence. Nevertheless, the Indiana Court of Appeals held its plain language clearly demonstrated the plaintiff's "intent to indemnify [the defendant] for its negligence." The court emphasized that the release stated the plaintiff agreed "to indemnify [the defendant] for 'all claims, demands, rights and causes of action of any kind, w*hether arising from [the plaintiff's] own acts or those of [the defendant]*.' " (Emphasis in original.) *Avant*, 826 N.E.2d at 12. It also relied on the inclusion in the release of "terms generally associated with negligence," including " 'claims,' 'causes of action,' 'acts,' 'damage,' 'responsibility,' and 'injury.' " *Avant*, 826 N.E.2d at 11. Significantly, the *Avant* court also distinguished *Powell* on the basis that the exculpatory clause in that case made no reference to the defendant's acts. *Avant*, 826 N.E.2d at 12. It stated as follows:

¶ 54        "The clause [in *Powell*] did not specifically contemplate the issue of indemnification for injuries and/or damages resulting from the [defendant's] *actions*; in fact, there was *no reference whatsoever to acts, actions, or conduct of the [defendant] and its employees*." (Emphases added.) *Avant*, 826 N.E.2d at 12.

¶ 55        I find the circumstances of the present case are more similar to *Powell* than *Avant*. Not only does the parties' exculpatory agreement not contain the word negligence, it also fails to make any reference to acts, actions, or conduct of defendant. This latter fact was the key point on which the *Avant* court distinguished *Powell*.

¶ 56        On appeal, defendants point out that under paragraph 5D of the hunter agreement, plaintiff agreed he was "solely responsible for [his] safety" and "to inspect and secure all hunting stands for safety and to wear a harness." They assert this language "assign[ed] the entirety of Defendant's duty of care with respect to the hunting stand to Plaintiff." Citing *Avant*, they further contend that, when read together, the language in paragraph 5D and the

- 22 -

release provisions of paragraph 6 are equivalent to a specific and explicit reference to defendants' own negligence. Again, however, paragraph 5D makes no reference to any act, actions, or conduct of defendants. In *Avant*, it was the explicit reference to the defendant's "acts" along with terms generally associated with negligence that "conveyed the concept" of negligence.

¶ 57        Here, there is no specific or explicit reference to defendant's own negligence in either paragraph 6 or paragraph 5D, nor do those paragraphs refer to any act of defendants or their employees. Under these circumstances, I would find the exculpatory clause at issue fell short of showing, "clearly and unequivocally," that plaintiff knowingly and willingly agreed to be responsible for damages occasioned by the defendant's negligence. *Marsh*, 707 N.E.2d at 1000.

¶ 58                        B. Latent Danger v. Inherent Risk

¶ 59        Indiana law further provides that even when an exculpatory clause does not make a specific and explicit reference to a defendant's negligence, it may still "act to bar liability for those damages incurred which are inherent in the nature of the activity." *Marsh*, 707 N.E.2d at 1000. In other words, "[t]he requirement of specificity is only necessary when the risk of harm is a latent danger, *i.e.*[,] the defendant's own negligence." *Marsh*, 707 N.E.2d at 1000. I find three Indiana cases instructive on this point.

¶ 60        First, in *Marsh*, 707 N.E.2d at 999, the plaintiff was injured on a wind tunnel ride called the "Dyna Soar," which "simulate[d] the experience of free-fall by projecting columns of air through a cable trampoline upon which patrons of the ride levitate[d]." The plaintiff fell off of a column of air, fractured his ankle, and sued the owner of the ride for negligence. *Marsh*, 707 N.E.2d at 999. The reviewing court first held that a release signed by the plaintiff failed to

- 23 -

specifically and explicitly refer to the defendant's own negligence. *Marsh*, 707 N.E.2d at 1001. It also concluded that the plaintiff's injury "was not allegedly derived from a risk which was inherent in the nature of the ride," stating as follows:

> "[The defendant] instructed [the plaintiff] that he would only levitate three to four feet from the ground. When the ride started, however, [the plaintiff] was allegedly shot fifteen feet in the air and subsequently dropped to the ground. Such a risk is not inherent in the nature of a wind tunnel ride. Thus, if, indeed, the accident occurred as [the plaintiff] describes, the injury must have resulted from the negligence of [defendant]." *Marsh*, 707 N.E.2d at 1001.

¶ 61 Second, in *Anderson v. Four Seasons Equestrian Center, Inc.*, 852 N.E.2d 576, 578-79 (Ind. Ct. App. 2006), the plaintiff received riding lessons and boarded her horse with the defendant equestrian center. She was injured when she attempted to mount her horse, the horse moved, and she fell. *Anderson*, 852 N.E.2d at 579. The plaintiff filed suit against the equestrian center and its owner, alleging "they were negligent in 'caring for, conditioning and training' her horse." *Anderson*, 852 N.E.2d at 579. The defendants moved for summary judgment, arguing, in part, that an exculpatory clause contained in a waiver the plaintiff signed barred her cause of action. *Anderson*, 852 N.E.2d at 579. The trial court granted summary judgment in defendants' favor, finding, in part, that the plaintiff was injured as a result of an inherent risk related to the equine activity. *Anderson*, 852 N.E.2d at 580.

¶ 62 On review, the Indiana Court of Appeals agreed that the plaintiff was injured as a result of an inherent risk. *Anderson*, 852 N.E.2d at 584. It noted the plaintiff signed a waiver, cautioning "that there were risks inherent in the nature of activity of dealing with horses and explained some of those risks." *Anderson*, 852 N.E.2d at 584. Enumerated risks included the

propensity of horses to behave in ways that might result in injury to a person and their unpredictability. *Anderson*, 852 N.E.2d at 584. The court held "the alleged acts of negligence in [the plaintiff's] complaint were exactly those for which she granted the Defendants a release of liability when she signed the Waiver." *Anderson*, 852 N.E.2d at 584.

¶ 63          Finally, in *Wabash County Young Men's Christian Ass'n, Inc. v. Thompson*, 975 N.E.2d 362, 363 (Ind. Ct. App. 2012), a minor softball player filed a complaint against the defendant after she was injured on its premises when she slid into second base during a softball game. The player alleged the defendant was negligent and violated its duty to protect her by failing "to inspect, warn, and implement preventive measures designed to eliminate or reduce dangers posed by the condition of the second base 'such that it was fixed as a rigid obstacle for participants to encounter while sliding into the base ***.' " *Wabash County*, 975 N.E.2d at 363.

¶ 64          On review, the Indiana Court of Appeals considered whether a release signed by the player's mother should serve to bar the defendant's liability for the player's injury. *Wabash County*, 975 N.E.2d at 366. The court concluded that "[s]liding into second base, notwithstanding its rigidity, is an activity inherent in the nature of playing baseball or softball and," as a result, the player's injury "was derived from a risk inherent in the nature of the activity." *Wabash County*, 975 N.E.2d at 367.

¶ 65          I find the present case is similar to *Marsh* and unlike the factual circumstances of either *Anderson* or *Wabash County.* In the two latter cases, the plaintiffs' injuries were alleged to have occurred in the course of activities that proceeded in ways that were characteristic of those activities—a horse that moved when the rider attempted to mount it, a softball player sliding into a base. The plaintiffs alleged no defect resulting in injury. Conversely, in *Marsh*, the injury was alleged to have occurred in a manner that was atypical of the activity engaged in—a wind tunnel

ride that "shot" the plaintiff 15 feet in the air instead of levitating him three to four feet off the ground. The ride did not operate as intended. Similarly, in the present case, plaintiff alleged that, while hunting, he fell from a ladder stand when a strap securing the stand to the tree broke, and the stand became detached from the tree. He asserts a defect existed in the strap on the ladder stand and defendants' negligence in securing and maintaining the stand caused the defective condition. I find these circumstances similar to *Marsh*. The ladder stand in this case, like the ride in *Marsh*, was in an allegedly defective condition, and it was that condition which caused plaintiff's injury. While falling from a height might be a risk inherent in hunting from an elevated ladder stand, under Indiana law, a fall that results due to some defect in the ladder stand cannot be similarly characterized. Instead, it constitutes a latent risk. The ladder stand here did not operate as designed, and it is this allegedly defective condition that distinguishes the present case from *Anderson* and *Wabash County*. Applying Indiana law, I would find that plaintiff's injury was due to a "latent danger, *i.e.*[,] the defendant's own negligence" (*Marsh*, 707 N.E.2d at 1000), and not an "inherent risk" of ladder stand hunting.

¶ 66 For the above reasons, I dissent from the majority's decision and would reverse the trial court's grant of summary judgment in defendants' favor.